Steve W. Berman (*pro hac vice* to be filed)
Emilee N. Sisco (*pro hac vice* to be filed)
Stephanie A. Verdoia (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| MARK SPELLMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; and ATLANTIC COAST CONFERENCE,<br><br>Defendants. | Case No. 4:26-cv-07975<br><br>**COMPLAINT** |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....1

II. JURISDICTION AND VENUE ....3

III. PARTIES ....6

A. Plaintiff ....6

B. Defendants ....7

C. Co-Conspirators ....11

IV. FACTUAL BACKGROUND ....11

A. The NCAA's Governance Structure and Rulemaking Authority ....11

B. The NCAA's Restrictions on FBS Football Strength and Conditioning Coaches ....12

C. Relevant Market and Market Power ....15

D. Anticompetitive Effects of the Coaching Staff Restrictions ....18

V. CLASS ACTION ALLEGATIONS ....21

VI. ANTITRUST ALLEGATIONS ....23

COUNT I VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) ....23

Plaintiff Mark Spellman ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Defendants National Collegiate Athletic Association ("NCAA") and each of the so-called Power Five Conferences—Pac-12 Conference, The Big Ten Conference, Inc., Big Twelve Conference, Inc., Southeastern Conference, and Atlantic Coast Conference—for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff alleges as follows based on personal knowledge as to his own acts and upon information and belief as to all other matters.

## I. INTRODUCTION

1. This action challenges the NCAA's rules that artificially restrict the number of strength and conditioning coaches that Division I Football Bowl Subdivision ("FBS") schools may employ in their football programs. These restrictions constitute an unlawful horizontal agreement among competing employers—NCAA member institutions—to limit the hiring of football strength and conditioning professionals, thereby suppressing competition for coaching talent, depressing compensation, and eliminating employment opportunities that would otherwise exist in a free market.

2. Just as the NCAA's FBS schools compete on the football field, they also compete to hire football coaches and strength and conditioning professionals to train their football teams. But while there is no limit to the number of football skills coaches that FBS schools can hire, the NCAA and its members have agreed to bylaws that restrict FBS football programs to no more than five strength and conditioning coaches. These rules act as an artificial cap on employment in the football strength and conditioning profession at the Division I FBS level that limits programs regardless of institutional resources, athlete roster size, or the demands of modern football training science.

3. Strength and conditioning coaches are vital to elite-level college football programs because they bridge the gap between raw athletic talent and on-field performance. These specialists design and implement individualized training regimens that build the power, speed, agility, and endurance that competition at the highest-level demands, while also tailoring programs to the specific physical needs of each position. Just as importantly, they play a central

role in injury prevention and recovery, using evidence-based methods to keep athletes healthy across a grueling season and to rehabilitate them efficiently when injuries occur.

4. Strength and conditioning coaches also instill discipline, accountability, and mental toughness, often serving as year-round leaders who shape team culture during the offseason when other coaches have limited contact with players. They also collaborate closely with sports scientists, nutritionists, and medical staff to monitor workload and optimize each athlete's development, ensuring that players peak at the right moments. They also play a key role in recruiting and retention, since prospects and their families weigh the quality of a program's training, nutrition, and sports-science infrastructure when choosing where to commit. In a landscape where the margin between winning and losing is razor-thin, a skilled strength and conditioning staff can be the decisive factor that allows a program to field stronger, faster, more resilient, and more durable athletes than its rivals.

5. Strength and conditioning coaching for Division I FBS football is a specialized profession requiring specific certifications, extensive knowledge of sport-specific training methodology, and experience working with elite-level football athletes. As programs increasingly treat player development as a science, the value of specialists who can safely build elite athletes has surged. Combined with the enormous revenue, prestige, and job security tied to winning, this has driven schools to compete aggressively for proven strength and conditioning talent, pushing demand and compensation to record levels. Some FBS strength coaches command salaries in the millions of dollars. For example, the head strength coach at the University of Tennessee currently earns an annual salary of approximately $1.2 million, and the head strength coach for Oklahoma State University's football team earns approximately $1.1 million annually. The head football strength and conditioning coaches at Alabama, Ohio State, Iowa, and LSU each make over $800,000 annually.

6. Despite robust and growing demand for skilled strength and conditioning coaches across top-tier college football programs, the NCAA has chosen to impose what amounts to an unlawful restraint on the labor market by capping the number of such coaches FBS teams may employ. Rather than allowing schools to compete for talent and hire as many qualified

professionals as their needs and resources justify, the NCAA's restriction artificially suppresses employment opportunities, depresses wages, and limits competition for these specialized positions. In virtually any other industry, an agreement among competitors to fix the number of workers that may be hired would be condemned as a naked horizontal restraint of trade and would draw immediate antitrust scrutiny. The fact that this conduct occurs under the banner of collegiate athletics does not insulate it from the same legal principles that govern every other competitive labor market.

7. There are no legitimate procompetitive justifications for the NCAA's restriction on the number of strength and conditioning coaches that FBS football teams may employ. A cap on the number of coaches a school can hire does nothing to enhance competition among teams, improve the quality of the athletic product, or expand consumer choice; if anything, limiting the availability of qualified training staff degrades the development, safety, and on-field performance of student-athletes.

8. Accordingly, on behalf of a proposed class consisting of all individuals who sought employment as strength and conditioning coaches in NCAA Division I FBS football programs and whose employment opportunities or compensation were restricted by the NCAA's rules, Plaintiff requests an injunction permanently restraining Defendants from enforcing their unlawful and anticompetitive agreements to restrict the number of strength and conditioning coaches that FBS football programs can employ.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337 (commerce and antitrust regulation) because this action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because the proposed class consists of more than 100 members, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

10. Venue is proper in this District pursuant to the special antitrust venue statute, 15 U.S.C. § 22, because each Defendant is found, resides, has agents, or transacts business in this District. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because at least one Defendant resides in this District—Defendant Pac-12 maintains its principal place of business in San Ramon, California, which is within this District—and because a substantial part of the events or omissions giving rise to the claims occurred in this District. Multiple NCAA Division I FBS member institutions are located in this District, including Stanford University, the University of California, Berkeley, and San Jose State University. These institutions are subject to and have implemented the challenged NCAA Bylaw 11.7.4.4 within this District, limiting their hiring of football strength and conditioning coaches in direct compliance with the anticompetitive agreement alleged herein. The challenged restraint has directly suppressed coaching employment opportunities at these institutions and has deprived qualified strength and conditioning professionals—including Plaintiff and Class members—of positions that would otherwise exist at programs within this District.

11. This Court has personal jurisdiction over each Defendant. Defendant Pac-12 is subject to general personal jurisdiction in this District because it maintains its principal place of business at 12647 Alcosta Blvd., San Ramon, California 94583, which is within this District. The Pac-12 conducts its governance, regulatory, and administrative activities from this location and is essentially "at home" in this District.

12. Defendant NCAA is subject to personal jurisdiction in this District because it purposefully directs its governance, rulemaking, and regulatory activities into this District. The NCAA promulgates and enforces rules—including the challenged Bylaw 11.7.4.4—that directly govern the hiring practices of FBS member institutions located in this District, including Stanford University, the University of California, Berkeley, and San Jose State University. The NCAA derives substantial revenue from the athletic activities of its member institutions in this District through media rights agreements, licensing fees, and distributions related to intercollegiate athletic competition. The NCAA also conducts investigations, imposes sanctions, and enforces its bylaws against institutions in this District, maintaining continuous and

systematic contacts with this forum. Plaintiff's claims arise out of and relate to the NCAA's promulgation and enforcement of the challenged coaching staff restrictions, which have their intended anticompetitive effect on member institutions located in this District.

13. Defendant Big Ten is subject to personal jurisdiction in this District because its member institutions include the University of California–Los Angeles, the University of Southern California, the University of Oregon, and the University of Washington, all of which are located in California or the Pacific region and participate in athletic competition within this District. The Big Ten's member institutions located in California are subject to and implement the challenged coaching staff restrictions in this District, and the Big Ten derives substantial revenue from athletic activities conducted in this District. Defendant Big 12 is subject to personal jurisdiction in this District because its member institutions, including the University of Arizona and Arizona State University, engage in regular athletic competition with institutions in this District, and the Big 12 participates in the promulgation and enforcement of the challenged NCAA bylaws that have their intended anticompetitive effect on institutions and coaching professionals in this District.

14. Defendant SEC is subject to personal jurisdiction in this District because the SEC and its member institutions engage in regular athletic competition with institutions located in this District, derive revenue from media contracts and licensing arrangements that include games played in this District, and participate in the collective adoption and enforcement of the challenged NCAA bylaws that have a direct and intended anticompetitive effect in this District.

15. Defendant ACC is subject to personal jurisdiction in this District because two of its member institutions—the University of California–Berkeley and Stanford University—are located within this District. The ACC governs and regulates the athletic programs of these institutions from within this District, derives revenue from athletic activities conducted in this District, and its member institutions in this District are directly subject to and implement the challenged coaching staff restrictions. The ACC's contacts with this District are continuous, systematic, and directly related to the claims alleged herein.

16. In addition, each Defendant is subject to personal jurisdiction in this District because each was engaged in an illegal anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. The conspiracy alleged herein constitutes a nationwide scheme to restrain trade in the Football S&C Coaching Market, and its effects are felt at every FBS member institution, including those located in this District. Each Defendant knew or should have known that the challenged restraint would suppress coaching employment opportunities and depress compensation for strength and conditioning professionals at FBS institutions in this District.

## III. PARTIES

### A. Plaintiff

17. Plaintiff Mark Spellman, an individual, is a resident of Stratford, Connecticut. Plaintiff is a qualified and experienced strength and conditioning coach who has held positions as a strength coach at several non-FBS Division I schools including Villanova University, Campbell University, Fairfield University, and George Washington University. Plaintiff has extensive experience designing and implementing strength and conditioning programs for collegiate football players, including developing position-specific training regimens, managing athlete workload, and overseeing injury prevention protocols.

18. Plaintiff Spellman has sought employment as a football strength and conditioning coach at numerous NCAA Division I FBS institutions, including: University of Indiana, University of Tennessee, University of Texas, Bowling Green University, Notre Dame University, Oregon State University, University of Miami, Marshall University, Auburn University, Clemson University, University of Connecticut, James Madison University, University of Florida, Troy University, University of Louisiana, University of Mississippi, Coastal Carolina University, University of Oklahoma, Syracuse University, University of Missouri, Michigan State University, University of Minnesota, University of North Carolina–Chapel Hill, and Virginia Tech University. He did not receive any of the jobs that he applied for. Upon information and belief, in many instances, Plaintiff was not hired because the FBS

programs to which he applied had already filled all five strength and conditioning coaching positions permitted under NCAA Bylaw 11.7.4.4, or did not have an open position because the bylaw capped the total number of such positions at five. Absent the NCAA's artificial cap, the programs to which Plaintiff applied would have had additional strength and conditioning positions available, and Plaintiff, who is qualified for such positions, would have had a materially greater opportunity to obtain employment. Plaintiff Spellman plans to continue to seek employment as a football strength and conditioning coach at an NCAA Division I FBS institution, including located in this District.

19. Plaintiff Spellman holds several nationally recognized certifications in strength and conditioning, including certification from the National Strength and Conditioning Association ("NSCA") and is a Registered Strength and Conditioning Coach with Distinction. Plaintiff's employment opportunities and compensation have been directly and adversely affected by the NCAA's rules limiting the number of strength and conditioning coaches that FBS football programs may employ. Specifically, the NCAA's cap on strength and conditioning coaching positions has: (a) reduced the total number of available FBS strength and conditioning positions for which Plaintiff could compete; (b) depressed the compensation that Plaintiff has received in his career because the restricted number of FBS positions artificially limits the demand for qualified strength and conditioning coaches and suppresses competition among employers for their services; and (c) denied Plaintiff the opportunity to advance his career at an FBS institution, despite possessing the qualifications, certifications, and experience to perform such work at the highest collegiate level. Plaintiff's injuries are of the type the antitrust laws were intended to prevent and flow directly from the anticompetitive nature of the challenged restraint.

**B. Defendants**

20. **Defendant National Collegiate Athletic Association ("NCAA")** is an unincorporated association with its principal office in Indianapolis, Indiana. The NCAA is a joint venture of approximately 1,100 member colleges and universities that governs intercollegiate athletics in the United States. The NCAA promulgates and enforces rules and regulations

governing its member institutions, including rules limiting the number of strength and conditioning coaches that FBS football programs may employ. The NCAA generates billions of dollars in annual revenue from its member institutions' athletic programs through media rights agreements, licensing fees, corporate sponsorships, and distributions related to championship events. The NCAA's rules, including the challenged coaching staff restrictions, are binding on all member institutions, and the NCAA enforces compliance through an investigative and sanctioning apparatus that can impose penalties including loss of eligibility, scholarship reductions, postseason bans, and financial penalties.

21. **Defendant Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal place of business located in this District at 12647 Alcosta Blvd., San Ramon, California 94583. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

22. The Pac-12's current members are the following 9 institutions: Oregon State University, Washington State University, Fresno State University, Boise State University, Texas State University, Colorado State University, San Diego State University, Utah State University and Gonzaga University. All of the Pac-12's members except for Gonzaga University are also members of the NCAA's Division I, Football Bowl Subdivision.

23. Defendant Pac-12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff and Class members, and will continue to damage Plaintiff and Class members unless enjoined.

24. **Defendant The Big Ten Conference ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

25. The Big Ten's members are the following 18 institutions: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University

of Wisconsin–Madison, University of Maryland, University of Oregon, University of Washington, University of California–Los Angeles, University of Southern California, and Rutgers University. All of the Big Ten's members are also members of the NCAA's Division I, Football Bowl Subdivision.

26. Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff and Class members, and will continue to damage Plaintiff and Class members unless enjoined.

27. **Defendant The Big 12 Conference ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

28. The Big 12's current members are the following 16 institutions: Baylor University, Iowa State University, University of Kansas, Kansas State University, Oklahoma State University, Texas Christian University, Texas Tech University, University of Arizona, Arizona State University, Brigham Young University, University of Cincinnati, University of Colorado, University of Houston, University of Central Florida, University of Utah and West Virginia University. All of the Big 12's members are also members of the NCAA's Division I, Football Bowl Subdivision.

29. Defendant Big 12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff and Class members, and will continue to damage Plaintiff and Class members unless enjoined.

30. **Defendant Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

31. The SEC's current members are the following 16 institutions: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of Oklahoma, University of South Carolina, University of Tennessee, Vanderbilt University,

University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, University of Texas–Austin, and Texas A&M University. All of the SEC's members are also members of the NCAA's Division I, Football Bowl Subdivision.

32. Defendant SEC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff and Class members, and will continue to damage Plaintiff and Class members unless enjoined.

33. **Defendant Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 620 South Tryon Street, Suite 1200, Charlotte, North Carolina 28202. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I.

34. The ACC's current members are the following 18 institutions: Boston College, University of California–Berkeley, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of North Carolina–Chapel Hill, North Carolina State University, University of Pittsburgh, Syracuse University, Stanford University, Southern Methodist University, University of Virginia, Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, University of Louisville. Also, as the ACC stated in its 2012-13 annual report, the University of Notre Dame "officially joined the ACC on July 1, 2013 … Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs." All of the ACC's members are also members of the NCAA's Division I, Football Bowl Subdivision.

35. Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff and Class members, and will continue to damage Plaintiff and Class members unless enjoined.

36. Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five Conference Defendants" or "Conference Defendants," and these

conferences are referred to collectively in this Complaint as the "Power Five" or "Power Five Conferences."

**C. Co-Conspirators**

37. Various other persons and entities have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes, including the Division I Council, the Football Oversight Committee, and various other subcommittees responsible for proposing, reviewing, and adopting rules governing coaching staffs. Representatives of those schools and conferences voted to adopt the rules restricting the number of strength and conditioning coaches that FBS programs may employ and thus agreed to impose the restraint on trade described herein. Each co-conspirator institution agreed to abide by and enforce the challenged restrictions as a condition of NCAA membership, and each such institution has implemented the restrictions at its own football program, thereby giving effect to the horizontal agreement to suppress competition in the Football S&C Coaching Market.

## IV. FACTUAL BACKGROUND

**A. The NCAA's Governance Structure and Rulemaking Authority**

38. The NCAA is a voluntary association of approximately 1,100 colleges and universities that participate in intercollegiate athletics. NCAA schools are organized into three divisions: Division I, Division II, and Division III. In the sport of football, Division I schools are further divided into two subdivisions: the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS"). The NCAA's member institutions compete against one another both on the playing field and in the market for the services of coaches and other athletic personnel.

39. Among the three divisions of competition into which NCAA member teams are organized, the most talented athletes and the most highly paid coaches at the collegiate level are concentrated in Division I sports. In the sport of football, FBS programs feature the highest level of competition, greatest resources, and top-level coaching talent.

40. The NCAA operates through a governance structure in which member institutions collectively establish rules governing intercollegiate athletics. For Division I, the primary legislative body is the Division I Council, composed of representatives from member institutions and conferences. Rules are adopted through a collective decision-making process in which competitor institutions—which compete against one another for coaching talent, athletes, and athletic prestige—agree to abide by common regulations that restrict their own competitive conduct. The adoption of NCAA Bylaw 11.7.4.4, limiting the number of strength and conditioning coaches, was the product of this collective decision-making process, in which representatives of competing FBS member institutions voted to impose a binding, uniform cap on the number of football strength and conditioning coaches each institution could employ. This process constitutes an agreement among horizontal competitors within the meaning of Section 1 of the Sherman Act.

41. The NCAA's rules, including coaching staff limitations, are binding on all member institutions. Member institutions that violate NCAA rules are subject to investigation, sanctions, and penalties, including loss of eligibility, scholarship reductions, postseason bans, and other punitive measures. This enforcement mechanism ensures uniform compliance with the agreed-upon restrictions.

**B. The NCAA's Restrictions on FBS Football Strength and Conditioning Coaches**

42. To pursue their competitive goals, Division I FBS schools compete to hire top coaches for their football programs. NCAA schools place importance on the hiring of coaches that will make their teams competitive and help draw high-level players to their institutions.

43. Football coaching staffs have grown substantially in recent years, as schools realize that more coaches allow for more individualized attention to each player and each aspect of the sport. Today the average FBS football staff size ranges from 30 to 45 total personnel, consisting of a head coach, numerous on-field position coaches, strength and conditioning staff, analysts, and recruiting/operations personnel.

44. In the same way that they compete for the best head coaches and position coaches, FBS programs also compete to hire strength and conditioning coaches who will help

improve the performance of their teams, teach valuable skills to players, and reduce injury risks. Strength and conditioning coaches are essential to elite college football programs because they bridge the gap between raw athletic talent and on-field performance. At the highest level of competition, where players are recruited for their natural ability, the difference between winning and losing often comes down to which team is faster, more powerful, and better conditioned in the fourth quarter.

45. Strength and conditioning coaching for Division I FBS football is a specialized profession requiring specific certifications, extensive knowledge of sport-specific training methodology, and experience working with elite-level football athletes. These coaches design and oversee individualized training programs that build the strength, speed, and endurance the modern game demands, while also tailoring regimens to the distinct physical needs of each position. Equally important, they play a central role in injury prevention and durability, using movement screening, corrective exercise, and carefully crafted workloads to keep athletes healthy across a demanding season. Because they interact with players nearly every day of the year, often more than any other staff member, strength and conditioning coaches also become key figures in developing discipline, mental toughness, accountability, and team culture. In a landscape where roster talent is increasingly comparable across top programs, a skilled strength and conditioning staff can provide the marginal physical and psychological edge that separates championship contenders from the rest.

46. Because of their value to their teams, the demand for football strength and conditioning professionals has grown exponentially at the FBS level. FBS football programs compete vigorously for these coaches on compensation and some command salaries in the millions of dollars. For example, the head strength coach for the football team at the University of Tennessee currently earns an annual salary of approximately $1.2 million, and the head strength coach for Oklahoma State University's football team earns approximately $1.1 million annually. The head football strength and conditioning coaches at Alabama, Ohio State, Iowa, and LSU each make over $800,000 annually.

47. Despite this thriving labor market, indeed likely because of it, the NCAA and its members have illegally agreed to restrict the number of strength and conditioning coaching positions that are available at FBS football programs.

48. The NCAA enacted NCAA Bylaw 11.7.4.4 ("Limit on the Number of Strength and Conditioning Coaches -- Bowl Subdivision Football [FBS].") which states:

> In bowl subdivision football, not more than five strength and conditioning coaches are permitted to work with football student-athletes in any capacity, including all workouts (required and voluntary), practices and game-related activities.

49. The NCAA's rules restrict the number of strength and conditioning professionals who may work directly with FBS football players, limiting programs regardless of institutional resources, athlete roster size, or the demands of modern football training science. These restrictions operate as a hard cap on employment in the football strength and conditioning profession at the Division I FBS level.

50. This artificial restraint prevents FBS schools from competing to offer additional employment opportunities to more football strength and conditioning coaches in accordance with what the open market would otherwise dictate. Absent this restraint, FBS schools would compete for strength and conditioning coaching talent in the same way they compete for talent in other football coaching positions—by hiring additional qualified individuals.

51. The NCAA's rules further restrict the scope of permissible activities for strength and conditioning personnel, prohibiting them from engaging in certain coaching-related functions such as sport-specific technical instruction and limiting their interactions with student-athletes outside of designated weight room and conditioning sessions. These activity restrictions effectively reduce the value and scope of strength and conditioning positions, further suppressing demand and compensation for qualified professionals in this field.

52. These restrictions are not the product of independent decision-making by individual institutions. Rather, they are collectively imposed through the NCAA's legislative process, in which competing institutions agree to limit their own hiring of football strength and conditioning professionals. No individual institution could unilaterally impose such restrictions

on the market; the restraint operates only because it is adopted as a binding horizontal agreement among all FBS member institutions. But for the collective agreement, each FBS institution would independently determine how many strength and conditioning coaches to employ based on its own competitive needs, financial resources, and assessment of the benefits of additional coaching staff. The agreement eliminates this independent decision-making and replaces it with a uniform cap that each institution is obligated to obey under penalty of NCAA sanctions. The challenged restraint is thus a classic horizontal agreement among competitors to restrict the terms on which they compete for labor.

53. There is also no support for these restrictions from a sports science perspective, and if anything, they serve to reduce the benefits of strength and conditioning coaching to athletes by restricting FBS programs' ability to provide individualized, position-specific, and comprehensive strength and conditioning training to their football student-athletes.

**C. Relevant Market and Market Power**

54. The relevant product market is the market for the services of strength and conditioning coaches at NCAA Division I FBS football programs (the "Football S&C Coaching Market"). Strength and conditioning coaching for Division I FBS football is a specialized profession requiring specific certifications, extensive knowledge of sport-specific training methodology, and experience working with elite-level football athletes. This specialized skill set distinguishes the Football S&C Coaching Market from other markets for coaching or fitness professionals.

55. The relevant geographic market is the United States. NCAA Division I FBS member institutions recruit and hire strength and conditioning coaches on a nationwide basis, and strength and conditioning professionals routinely relocate across the country to accept positions at FBS programs. Furthermore, FBS schools often engage in competitive play with other FBS schools across state lines, and the games are frequently broadcast across state lines.

56. The challenged restraint directly affects interstate commerce. The hiring of strength and conditioning coaches at FBS football programs involves interstate transactions, as coaches routinely relocate across state lines to accept employment, and FBS institutions recruit

coaching talent on a nationwide basis without regard to state boundaries. FBS football generates billions of dollars in annual revenue through media rights agreements, conference distributions, ticket sales, corporate sponsorships, and merchandise licensing, all of which flow across state lines. The compensation paid to strength and conditioning coaches at FBS programs is funded in substantial part by these interstate revenue streams. The restraint on the number of coaching positions directly suppresses interstate commerce by reducing the total number of coaching employment transactions that would otherwise occur across state lines and by depressing the aggregate compensation flowing to coaching professionals in the national market.

57. NCAA Division I FBS member institutions are the primary employers—and thus the buyers—of football strength and conditioning coaching services in the relevant market. The approximately 133 FBS member institutions collectively represent the overwhelming majority of demand for elite-level football strength and conditioning coaching services. Division I is the only place where coaches can provide their services at the top, amateur collegiate level. Lower amateur levels are not reasonably comparable; Division II and III schools are less athletically competitive and generally lack the resources and prestige of Division I schools, which the NCAA itself recognizes by separating member schools into Divisions I, II, and III. And FBS football programs feature a significantly higher level of athletic competition—and significantly higher compensation for strength and conditioning coaches—than FCS programs.

58. FBS football strength and conditioning coaching jobs provide individuals who fill those positions with the greatest opportunity to work with the highest quality players, compete against the highest quality opponents, use the highest quality equipment, facilities, and training methods, and learn from other top-tier strength and conditioning professionals.

59. While some strength and conditioning professionals may find employment in professional sports, private training facilities, or other settings, the FBS market represents a distinct and dominant segment of demand for football-specific strength and conditioning expertise. The Division I FBS market also constitutes a distinct and dominant segment of demand for football-specific strength and conditioning expertise, set apart from professional sports, private training facilities, and other athletic settings by its scale, structure, and mission.

Unlike professional teams—which employ relatively small, veteran rosters of fully developed athletes—FBS programs manage large rosters of up to 105 players who require intensive, year-round physical development on a compressed collegiate timeline. Unlike in the NFL, where players are fully-grown men, many of whom also privately employ outside strength and conditioning coaches, the demand here is not merely for conditioning but for the long-term athletic transformation of eighteen-to-twenty-two-year-olds, integrated tightly with academic schedules, NCAA regulatory compliance, and the recruiting arms race that defines the sport. This sets the FBS apart from private training facilities, which serve transient, fee-paying individuals or small groups for discrete goals such as combine or draft preparation rather than the sustained, team-wide programming that a competitive season demands.

60. With more than 130 institutions competing at the sport's highest amateur level, each fielding a dedicated, well-resourced strength and conditioning staff and investing heavily in specialized facilities, the FBS represents a concentrated, institutionally funded, and uniquely football-centric source of demand that no other setting—professional, private, or recreational—replicates. Indeed, it is for this very reason that the NCAA's unlawful cap has targeted and restricted competition between FBS institutions for strength and conditioning coaches.

61. The market for FBS football strength and conditioning coaches is also distinct from the market for strength coaches in other sports at FBS schools because the demand for, supply of, and compensation paid to these professionals operate under fundamentally different economic conditions. Football is the dominant revenue-generating sport at the FBS level, producing the overwhelming share of athletic department income through media rights, ticket sales, donations, and conference distributions. This revenue concentration translates directly into the resources programs devote to football performance staff, with football strength coaches commanding salaries and budgets that dwarf those available in Olympic and non-revenue sports. The skill set is also sport-specific: developing the size, explosive power, and position-specific conditioning of a 100-plus-player football roster requires specialized expertise, year-round periodization, and management of a large support staff that does not readily transfer to or from sports such as basketball, baseball, track, or swimming. Because football strength coaches are

recruited from, and compete for positions within, a separate pool of football-specialized professionals—and because programs evaluate, hire, and pay them based on football-specific performance demands—they do not meaningfully compete in the same labor market as strength coaches in other FBS sports.

62. The NCAA's member institutions, acting collectively through the NCAA, possess market power in the Football S&C Coaching Market. The approximately 133 FBS member institutions constitute the only employers offering football strength and conditioning coaching positions at the highest amateur collegiate level. There are no reasonably interchangeable substitutes for FBS coaching positions because no other setting offers comparable compensation, competitive intensity, or career development opportunities. By agreeing through the NCAA to limit the number of strength and conditioning coaches each FBS football program may employ, member institutions collectively suppress demand for football strength and conditioning coaching services below the level that would exist in a competitive market free from the challenged restraints. The NCAA and its member institutions have exercised this market power by imposing and maintaining the challenged cap for years despite growing demand for coaching professionals, thereby artificially constraining the labor market.

**D. Anticompetitive Effects of the Coaching Staff Restrictions**

63. The NCAA's restrictions on the number of football strength and conditioning coaches produce substantial anticompetitive effects in the Football S&C Coaching Market, including but not limited to:

A. Suppressed demand: The restrictions artificially limit the total number of strength and conditioning coaching positions available at FBS programs, reducing overall employment opportunities for qualified strength and conditioning professionals;

B. Depressed compensation: By restricting the number of strength and conditioning positions, the rules reduce competition among FBS institutions for strength and conditioning talent, resulting in lower

aggregate compensation paid to football strength and conditioning coaches than would prevail in an unrestricted market;

C. Eliminated positions: Absent the restrictions, FBS member institutions would hire additional strength and conditioning coaches to improve athlete performance, reduce injury risk, enhance sport-specific physical development, and gain competitive advantages, creating positions that currently do not exist;

D. Reduced quality of services: By limiting the number of strength and conditioning coaches, the rules prevent FBS programs from providing individualized, position-specific, and comprehensive strength and conditioning training to their football student-athletes, resulting in suboptimal athlete development and increased injury risk; and

E. Barriers to entry: The restrictions create artificial barriers to entry for qualified strength and conditioning professionals who would otherwise gain employment in FBS football programs, limiting career advancement and professional development opportunities in the football strength and conditioning profession.

64. But for the NCAA's restrictions on strength and conditioning coaches, FBS member institutions—particularly those with substantial athletic budgets—would hire additional strength and conditioning professionals to enhance their football athlete performance, provide position-specific training, reduce injury rates, and gain competitive advantages. Upon information and belief, many FBS programs have expressed a desire to hire more than five football strength and conditioning coaches but are prevented from doing so solely by the challenged NCAA bylaw. Given that the average FBS football roster consists of approximately 85 to 105 players and that modern sports science supports individualized, position-specific training, programs with sufficient resources would, absent the cap, employ six, seven, eight, or more strength and conditioning coaches to meet the demands of their football programs. The restrictions prevent institutions from competing freely for strength and conditioning talent and

from deploying resources in ways that would benefit coaches, student-athletes, and the institutions themselves.

65. The NCAA's restriction limiting the number of strength and conditioning coaches that FBS member institutions may employ violates the Sherman Act, whether under a *per se*, "quick look," or "rule of reason" analysis. *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85 (1984). Here, the challenged restriction is a horizontal agreement among competitor employers to impose a uniform cap on the number of workers they may hire—a restraint that, in any other industry, would be condemned as a naked restriction on the labor market. *NCAA v. Alston*, 594 U.S. 69 (2021). The Supreme Court has recognized that NCAA rules restricting compensation and benefits for individuals participating in college athletics are subject to antitrust scrutiny under the rule of reason.

66. Plaintiff is not aware of what procompetitive justifications, if any, the NCAA may assert. Regardless, no legitimate procompetitive purpose is served by restricting the number of strength and conditioning coaches that FBS football programs may employ.

67. For example, the restrictions do not meaningfully help maintain competitive balance among FBS schools. It has become increasingly recognized that the notion of competitive equity in college sports is largely a myth, as disparities in resources, recruiting power, and institutional funding have long allowed a handful of programs to dominate at the expense of any genuine level playing field. Indeed, numerous other factors with a far greater impact on competitive balance than the number of strength coaches in a given football program remain entirely or largely unregulated. NCAA bylaws do not limit the amount of compensation that FBS schools can provide to the strength and conditioning coaches that they do employ or the compensation paid to other football coaches. Nor do the bylaws limit the number of employees that schools can bring on to assist their teams in non-coaching roles. The bylaws also do not regulate the amount of money that schools can spend on facilities and equipment and there is a wide gulf among Division I schools in terms of financial resources and spending. All in all, the NCAA bylaws do little to prevent the most talented high-school football players from

disproportionately attending a relatively small handful of schools instead of being spread equally among the various schools to achieve competitive parity.

68. Notably, NCAA bylaws do not restrict the number of strength and conditioning coaches that FBS schools can employ in any sport other than football, demonstrating that the challenged restraint is targeted specifically at the Football S&C Coaching Market and is not part of any generally applicable competitive-balance framework. Moreover, likely in recognition of the illegality of the previous rule, on June 25, 2024, the NCAA voted to eliminate its longstanding restriction on the number of "countable" football coaches that are permitted to provide on-field skill instruction to players during practice and games. As a result, while FBS teams still cannot hire more than five strength and conditioning coaches, they are free to employ an unlimited number of skills coaches. This change in the bylaws underscores that even the NCAA does not believe that coaching limits are necessary to produce FBS football or maintain a competitive balance between schools, and it further exposes the irrationality and anticompetitive nature of the surviving restriction on strength and conditioning coaches.

## V. CLASS ACTION ALLEGATIONS

69. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on his own behalf and on behalf of the following Class:

> All individuals who applied for, are currently employed in, or who will apply for or be employed in the future in, a position as a strength and conditioning coach at a NCAA Division I FBS football program, and who were denied employment or are subject to restrictions due to NCAA bylaws that cap, limit, or restrict the total number of strength and conditioning coaches an FBS football program may hire.
>
> This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

70. The Class is so numerous that joinder of all members is impracticable. There are approximately 133 NCAA Division I FBS member institutions, each maintaining a football strength and conditioning program. The NCAA's restrictions on the number of strength and conditioning coaches apply uniformly across all FBS programs, affecting hundreds of individuals

who have applied for these positions. Upon information and belief, the Class consists of hundreds of members.

71. Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members have been injured by the same unlawful conduct—the NCAA's imposition of restrictions on the number of strength and conditioning coaches that suppress employment opportunities and compensation for football strength and conditioning professionals across all FBS member institutions. The same legal theories and proof will establish Plaintiff's claims and those of the Class.

72. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of the Class, and Plaintiff has no interests antagonistic to or in conflict with the Class. Plaintiff has retained counsel experienced in complex antitrust class action litigation who will vigorously prosecute this action on behalf of the Class.

73. There are numerous questions of law and fact common to the Class. Common questions include: (a) whether the NCAA's rules limiting the number of football strength and conditioning coaches constitute an agreement among horizontal competitors; (b) whether those rules unreasonably restrain trade in the Football S&C Coaching Market; (c) whether the NCAA can demonstrate procompetitive justifications for the restrictions; (d) whether less restrictive alternatives exist that would achieve any legitimate objectives; and (e) whether the Class has suffered antitrust injury as a result of the restrictions.

74. Joinder is impracticable, and the prosecution of separate actions by individual Class members would impose heavy burdens upon the courts and Defendants and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants; and (b) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Concentrating the litigation in this forum will achieve economies of scale, avoid inconsistent adjudications, and promote judicial efficiency.

75. Defendants have acted or refused to act on grounds generally applicable to the members of the Class, thereby making final injunctive relief appropriate for the members of the Class as a whole.

## VI. ANTITRUST ALLEGATIONS

### COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

76. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

77. Defendants and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. Specifically, Defendants collectively adopted, maintained, and enforced NCAA Bylaw 11.7.4.4, which caps the number of football strength and conditioning coaches at five per FBS program. This agreement was reached through the NCAA's collective governance process, in which representatives of Defendants and their member institutions voted to impose a uniform, binding restriction on the number of strength and conditioning coaches that each FBS program could employ. These actions violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1. The trusts formed by Defendants' cartel have restrained trade and commerce in violation of Section 1 of the Sherman Act, and the behavior continues today.

78. This combination and conspiracy by the NCAA and its member schools (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anticompetitive effects, including *inter alia*, eliminating or suppressing, to a substantial degree, competition among FBS schools for skilled labor in the market.

79. As a direct and proximate result of Defendants' combinations and contracts to restrain trade and suppress competition for skilled labor, Plaintiff and members of the proposed Class have suffered antitrust injury to their business or property within the meaning of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Plaintiff and Class members have been deprived of employment opportunities that would exist in a competitive market free from the challenged restraint, have received lower compensation than they would have received absent the restraint,

and have been denied the benefits of free and fair competition on the merits. These injuries are of the type the antitrust laws were designed to prevent and flow directly from the anticompetitive nature of Defendants' horizontal agreement to cap the number of strength and conditioning coaching positions at FBS programs.

80. Defendants' agreements, combinations and/or conspiracies violate Section 1 of the Sherman Act, whether under a *per se*, "quick look," or "rule of reason" analysis.

81. Defendants' agreements or conspiracies have no procompetitive effect or purposes, or alternatively, any purported procompetitive justifications are outweighed by the anticompetitive effects of the restraint. Moreover, less restrictive rules can be implemented to achieve any purported procompetitive objectives.

82. Alternatively, Defendants' horizontal labor market restraints on Plaintiff and Class members should be determined to be either *per se* unlawful, or unlawful under the "quick-look" rule of reason, given the experience the courts have now had in evaluating the legality of such restraints.

83. Plaintiffs and members of the Class are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own and on behalf of all other similarly situated individuals, seeks the following relief:

A. Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. A finding that Defendants have violated Section 1 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Defendants acted on grounds generally applicable to Plaintiff and members of the Class;

C. A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

D. An injunction enjoining Defendants from continuing or reinstating their unfair and unlawful policies and practices as described within this Complaint;

E. Reasonable attorneys' fees and costs of the action; and

F. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable in this action.

DATED: July 31, 2026

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ *Benjamin J. Siegel*
Benjamin J. Siegel (SBN 256260)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
Emilee N. Sisco (*pro hac vice* to be filed)
Stephanie A. Verdoia (*pro hac vice* to be filed)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

*Attorneys for Plaintiff*